# In the United States Court of Federal Claims

No. 18-47C

(E-Filed: November 6, 2020)

|  |  |  |
|---|---|---|
| BRITTANY SPELLERS, | ) ) ) | Motion for Summary |
| Plaintiff, | ) ) | Judgment; RCFC 56; Dismissal for Lack of Jurisdiction; RCFC |
| v. | ) ) | 12(b)(1); RCFC 12(h)(3); Equal Pay Act; 29 U.S.C. |
| THE UNITED STATES, | ) ) | § 206(d); Substantially Equal Work; Retaliation Claim. |
| Defendant. | ) ) |  |

Sarah McKinin, Washington, DC, for plaintiff.

Ashley Akers, Trial Attorney, with whom were Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

OPINION AND ORDER

CAMPBELL-SMITH, J.

In her two-count complaint, plaintiff alleges that the United States Department of the Navy discriminated against her "based on gender," and "seeks equal pay, back pay, liquidated damages, and other relief available under the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d) et seq." (EPA). ECF No. 1 at 1. On May 4, 2020, defendant filed a motion for summary judgment, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). See ECF No. 32. In the motion, defendant also seeks dismissal of the second count in the complaint for lack of subject matter jurisdiction.[1] See id. at 7. Plaintiff filed a response to the motion on May 22,

---

[1] The court notes that defendant made its argument that the second count of plaintiff's complaint should be dismissed for lack of jurisdiction as part of its motion for summary

2020, ECF No. 35; and, defendant filed its reply on June 5, 2020, ECF No. 38. The motion is now fully briefed, and ripe for ruling. For the following reasons, defendant's motion is **DENIED** as to the first count of plaintiff's complaint, and **GRANTED** as to the second count of plaintiff's complaint.

I.   Background

At the time plaintiff filed her complaint on January 9, 2018, she had been employed by the "Naval Air Warfare Command [NAVAIR], at the Atlantic Test Range, Patuxent Naval Air Station, Maryland, since January 9, 2006." ECF No. 1 at 1. She alleges that the claims in her complaint accrued "on January 10, 2016, the effective date of [plaintiff's] annual performance-based pay increase which would have, but did not, place her at a pay level equal to that of her male . . . co-workers within the Telemetry Systems Branch who report to the same supervisory chain and perform substantially equivalent duties." Id. at 3.

Plaintiff was initially hired by the Navy "as a [s]ummer intern while pursuing an undergraduate degree in computer science." Id. She was hired as a full-time employee on June 24, 2007. See id. at 3-4. "Since 2006, [p]laintiff has provided Real-time Telemetry Processing System (RTPS) support of the Interactive Analysis and Display System (IADS) software application suite for all aircraft programs conducting flight test events at the Atlantic Test Ranges (ATR)." Id. at 4. Plaintiff alleges that she "is instrumental in ensuring safe flight operations by providing efficient resolutions to software issues that arise and thoroughly testing the software for production." Id.

Plaintiff continued to progress professionally in the following years, including joining the Engineer Scientist Development Program in 2007. See id. And on May 20, 2010, she "graduated with a [m]aster's degree in [e]ngineering specializing in project management from the University of Maryland, College Park." Id.

In April 2011, plaintiff and her coworkers were transitioned to a new personnel management system—"the NAVAIR Science and Technology Reinvention Laboratory [STRL] Personnel Management Demonstration Project." Id. at 5. This was "a new performance system, under which [p]laintiff was re-classified as a DP-1550 Scientist at Pay Band 3 (GS-11 equivalent)." Id. In August 2011, plaintiff's supervisor, Mr. Michael VanMeter, informed her "that she was 'way behind salary-wise which caused a flag in

---

judgment, rather than as a separate motion to dismiss. Despite the fact that defendant did not cite to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) in its motion, RCFC 12(b)(1) governs the dismissal of claims for lack of jurisdiction, and the court will analyze the relief requested accordingly.

the system,' causing her promotion to DP-1550-4 (GS-12 equivalent) to be delayed." Id. Her promotion was processed thereafter. See also id.

Plaintiff alleges that she is not being fairly paid as compared to three specific, male co-workers: Spencer Quade, Matthew Menard, and Gerald Berry. See id. at 6. "Each of these male co-workers is identically classified as a DP1550-4 computer scientist, yet have been compensated at the GS-13 equivalent level within the pay band DP-4 since the conversion to STRL if not earlier." Id.

Plaintiff did not receive a pay increase in January 2012 "due to the 19% increase she received in August 2011 which was intended to help her 'catch up' to her peers." Id. In an effort to demonstrate that she deserved further promotion, plaintiff "requested additional and more challenging duties beyond the IADS software support that were her primary duties." Id. at 7. According to plaintiff, "she began to develop and test software applications to help personnel working on Post Flight efforts," and she "continued to apply her [e]ngineering project management degree on work in support of the CH-53K aircraft program." Id.

In late 2013, Mr. VanMeter asked plaintiff to take on shared responsibility for the role of IADS Lead with two other co-workers, but plaintiff contends that "the responsibility for IADS fell primarily on her." Id. at 8. Plaintiff describes her duties as IADS Lead, as follows:

> As Lead for the IADS software application at the ATR facility, [p]laintiff delegates the workload in regard to IADS whether it is pre-mission, real-time and post mission, among a group of DP-1550 Scientists within the Telemetry Software Section (5.2.4.3.3). For new IADS releases, she performs software integration and functionality tests in a developmental environment before coordinating with other airfield sites for deployment to production for RTPS missions at ATR. Reporting to upper management, she documents weekly status updates for the section lead of the Telemetry Software Section, and a dedicated portion regarding IADS Testing and Issues/Resolutions. She participates in weekly Branch meetings to discuss any IADS and aircraft project related information.

Id.

Plaintiff's workload changed again in 2015, when her "workload increased greatly" as a result of personnel changes within IADS. Id. at 9. According to plaintiff, "[t]he majority of the IADS efforts currently fall on [her], along with the other tasks she

is now assigned by Mr. Quade," and she "continued to serve as the Telemetry Systems Branch (5.2.4.3) SharePoint Lead." Id.  She alleges that

> [c]ompared to her male co-workers in her section, she is carrying a significantly heavier workload, and is regularly expected to stay late to complete tasks . . . for other Section Leads.  Her male DP-1550-4 comparators within the Telemetry Branch leave at the end of their workdays without any questions asked and are not held to the same standards or given the same level of responsibility.

Id.

Plaintiff received modest pay increases in 2013, 2014, 2015, and 2016, but still remained a DP-1550-4 (GS-12 equivalent).  See id. at 7-10.  In 2016, plaintiff elevated the conversation about her career progress to Mr. Robert Sowa, Mr. VanMeter's supervisor, who advised her to be more like one of her male co-workers if she wanted to advance.[2]  See id. at 10.

In the timeframe relevant to the present case, plaintiff describes her duties, as follows:

> During 2016 and 2017, [p]laintiff continued to perform the IADS Lead role and SharePoint Lead role for the Telemetry Systems Branch.  In early 2017, [p]laintiff was additionally assigned by her Section Lead to be responsible for the RTPS V Releases of software developed by the Telemetry Software Section (5.2.4.3.3).  RTPS V Lead duties include gathering the requirements, documenting, building, testing, and coordinating for deployment of the new releases to the production systems. . . . [p]laintiffs' IADS support and RTPS V Releases are mission-critical and both fully affect all aircraft programs daily for all missions supported by RTPS.

Id. at 10.

In January 2017, plaintiff received a pay increase, but again remained as a DP-1550-4 (GS-12 equivalent).  See id. at 11.  On August 7, 2017, she "initiated an informal administrative [Equal Employment Opportunity (EEO)] complaint with the Civil Rights office at ATR," alleging that "she was being subjected to gender-based pay disparity

---

[2]   Plaintiff alleges that this was the second time she was so advised—Mr. VanMeter also told her to be more like a male co-worker during her 2013 performance review.  See ECF No. 1 at 7.

under the Equal Pay Act and a hostile work environment based on gender and pregnancy under Title VII." Id. at 11-12.  Plaintiff and the agency attempted to settle the claims through mediation, but the effort was unsuccessful.  Id. at 12.

Following her performance review in December 2017, plaintiff remained a DP-1550-4 level employee, but her pay increase "finally reach[ed] GS-13 step 1."  See id.

Plaintiff alleges two claims in her complaint.  First, she claims that the agency violated the EPA by paying her at a lower wage than her male comparators for "substantially similar" work.  Id. at 13.  Plaintiff states that "[a]ny differences in duties are attributable to an entirely typical division of labor."  Id.  And second, plaintiff alleges that the agency retaliated against her for "initiating an administrative EEO complaint in August 2017."  Id. at 14.

After plaintiff filed her complaint, the parties engaged in discovery, see ECF No. 11 (discovery scheduling order), and unsuccessfully explored the possibility of settlement, see ECF No. 28 (joint status report stating that settlement efforts were unsuccessful).  The court then set a briefing schedule for the motion at bar.  See ECF No. 31 (scheduling order).

Defendant now argues that it is entitled to summary judgment as to Count I of plaintiff's complaint for two reasons.  First, defendant contends that plaintiff has failed to make a prima facie showing of an EPA violation because the co-workers she offers as comparators "do not perform substantially equal job duties."  ECF No. 32 at 7.  And, defendant continues, "even if the Court were to conclude that [plaintiff] and the named comparators did perform substantially equal job duties, the uncontroverted facts demonstrate that the salary disparity between [plaintiff] and the named comparators is the result of a gender-neutral merit system and not gender discrimination."  Id.

In addition, defendant moves to dismiss Count II of plaintiff's complaint, a retaliation claim, for lack of subjection matter jurisdiction.  See id. at 8.

II.   Legal Standards

    A.   Summary Judgment

According to this court's rules, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be

drawn in favor of the nonmoving party." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted).

A genuine dispute of material fact is one that could "affect the outcome" of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power, 16 F.3d at 1202 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial. Celotex, 477 U.S. at 324.

The Supreme Court of the United States has instructed that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. A nonmovant will not defeat a motion for summary judgment "unless there is sufficient evidence favoring the nonmoving party for [the fact-finder] to return a verdict for that party." Id. at 249 (citation omitted). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power, 16 F.3d at 1202 (citing Celotex, 477 U.S. at 323).

      B.     Dismissal for Lack of Subject Matter Jurisdiction

Pursuant to the Tucker Act, the court has jurisdiction to consider "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). To invoke the court's jurisdiction, plaintiffs must show that their claims are based upon the Constitution, a statute, or a regulation that "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." United States v. Mitchell, 463 U.S. 206, 216-17 (1983) (quoting United States v. Testan, 424 U.S. 392, 400 (1976)). See also Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (stating that to fall within the scope of the Tucker Act "a plaintiff must identify a separate source of substantive law that creates the right to money damages") (citations omitted).

Plaintiffs bear the burden of establishing this court's subject matter jurisdiction by a preponderance of the evidence. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). In reviewing plaintiffs' allegations in support of jurisdiction, the court must presume all undisputed facts are true and construe all reasonable inferences in plaintiffs' favor. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982); Reynolds, 846 F.2d at 747 (citations omitted). If, however, a motion to dismiss "challenges the truth of the jurisdictional facts alleged in the complaint, the . . . court may consider relevant evidence in order to resolve the factual dispute." Reynolds, 846 F.2d at 747. If the court determines that it lacks subject matter jurisdiction, it must dismiss the complaint. See RCFC 12(h)(3).

III.   Analysis

    A.   EPA Claim (Count I)

The EPA bars employers' discrimination against employees on the basis of sex. Specifically, it provides:

> No employer . . . shall discriminate, . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1).

The parties agree that plaintiff bears the burden of establishing a prima facie case under the EPA, which requires her to demonstrate that the agency paid "different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974) (internal quotation marks omitted). See ECF No. 32 at 25 (citing Corning, 417 U.S. at 195); ECF No. 35 at 33 (citing Corning, 417 U.S. at 195). Put another way, to carry her burden, plaintiff must identify a male comparator whose work was "substantially equal," when focusing on "the individuals' primary rather than incidental duties." Jordan v. United States, 122 Fed. Cl. 230, 241 (2015) (internal quotations omitted). "It is the job as a whole, not just selected aspects of it that must form the basis of the comparison." Ellison

v. United States, 25 Ct. Cl. 481, 487 (1992) (citing Gunther v. Cty. of Washington, 623 F.2d 1303, 1309 (9th Cir. 1979), aff'd, 452 U.S. 161 (1981)).

"Once plaintiff establishes her prima facie case, the burden shifts to defendant to demonstrate one of [the] four statutorily articulated affirmative defenses." Brooks v. United States, 101 Fed. Cl. 340, 344 (2011).

Here, plaintiff identifies three comparators: Mr. Quade, Mr. Menard, and Mr. Barry. See ECF No. 1 at 6. According to plaintiff, "[e]ach of these male co-workers is identically classified as a DP1550-4 computer scientist, yet have been compensated at the GS-13 equivalent level within the pay band DP-4 since the conversion to STRL if not earlier." Id.

According to defendant, plaintiff cannot make a prima facia case for an EPA violation based on any of the three comparators as alleged in her complaint because despite the fact that each of the four employees are included in the same broad classification, their "duties are not substantially equal." ECF No. 32 at 30. "For example," defendant argues, "while [plaintiff's] job duties involved manually utilizing software tests, Mr. Barry's duties included creating software tests." Id. (citing ECF No. 32-1 at 103 (VanMeter affidavit)). Mr. Barry also "dealt with special parameters, derived complicated calculations, and translated formats to overcome issues," among other things, while plaintiff did not. Id. (citing ECF No. 32-1 at 104).

Defendant also claims that Mr. Menard's duties are not a useful basis of comparison for plaintiff's:

> [W]hereas [plaintiff's] duties consisted almost entirely of testing software, Mr. Menard . . . was responsible for developing software, software testing, and quality assurance. Mr. Menard was also responsible for designing, coding, and debugging numerous applications. [Plaintiff] did not have comparable duties.

Id. (citations omitted).

And finally, defendant contends that Mr. Quade's job duties cannot be compared to plaintiff's because he held a supervisory position, and in fact assigned plaintiff her tasks. See id. In addition to his management role, "Mr. Quade was responsible for developing software products through modifying specialized code and complex algorithms. [Plaintiff] did not hold any comparable managerial or leadership roles nor

8

was she assigned comparable software developmental duties." Id. at 31 (citations omitted).

Defendant offers affidavits to support the duties it claims were assigned to each of the alleged comparators. See id. (citing ECF No. 32-1 at 90-92 (Quade affidavit), 102-05 (VanMeter affidavit)). The problem for defendant, however, is that the evidence plaintiff offers in response appears to be potentially contradictory to the proof offered by defendant with regard to the nature of plaintiff's duties. In the appendix attached to plaintiff's response, she includes copies of her performance evaluations dating back to 2010. See ECF No. 35-1 at 130-89. Generally, the evaluations demonstrate that the plaintiff was a dedicated and determined employee, who received almost entirely positive marks. See id. And, more specifically, the evaluations suggest that plaintiff did— contrary to defendant's argument—perform coding and program development work. See also id.

The following are examples of language in plaintiff's performance evaluations that, without further explanation, prevent the court from accepting defendant's argument that plaintiff did not perform tasks requiring the same level of skill as her male comparators. For each of the performance evaluations listed below, Mr. VanMeter was plaintiff's reviewing supervisor with the exception of the final evaluation on which Valerie Rooney was plaintiff's reviewing supervisor. See id.

1. Performance Evaluation for October 1, 2012, through September 30, 2013

- "I develop and test new software applications." ECF No. 35-1 at 138 (emphasis added).

- "I spend the majority of my time developing code in C# to create real-time and post-flight application tools to benefit our customers or our ATR personnel. I also write code in the C language to translate algorithms received by our flight test community into an ingestible format to be used with the software tools Omega Data Environment (ODE) and Omega-Serv which are then processed for our flight test engineers to utilize post flight." Id. at 139 (emphasis added).

- "Using Visual Studio C#, I developed a software application tool for the Manned Flight Simulator (MFS) sessions," and "am currently developing a software application tool to detect differences between Telemetry Attributes Transfer Standard (TMATS) files we receive from

- Air Vehicle Modification and Instrumentation (AVMI) and their derived parameters from flight to flight." Id. at 140 (emphasis added).

- In the supervisor assessment, Mr. VanMeter recognized plaintiff's work, noting that she "has taken extra steps in using her new skills in C# to apply to customer requirements, namely <u>building applications</u> for Manned Flight Simulator." Id. at 142 (emphasis added).

2. Performance Evaluation for October 1, 2013, through September 30, 2014

- "I am currently <u>developing</u> and testing software applications in C# for our upcoming version of RTPS V." Id. at 145 (emphasis added).

- In the supervisor assessment, Mr. VanMeter stated: "As a <u>software developer</u> [plaintiff] has gone up and above her line of responsibility in addressing the task of centralizing all engineering and development efforts relative to our product line for strict configuration control." Id. at 147 (emphasis added).

- "I was asked by my upper management to take on the responsibility of being the new lead for our current display and analysis system at RTPS, IADS, and <u>continue my current programming efforts</u> which I have accepted." Id. at 151 (emphasis added).

3. Performance Evaluation for October 1, 2014, through September 30, 2015

- "I continuously <u>develop</u> and test multiple software applications." Id. at 153 (emphasis added).

- Mr. VanMeter's assessment notes that plaintiff "has been working with Spencer's software team to <u>develop</u> new interfaces." Id. at 157 (emphasis added).

4. Performance Evaluation for October 1, 2015, through September 30, 2016

- Mr. VanMeter's assessment noted that plaintiff "has been working with Spencer's software team to <u>develop</u> new interfaces of ODE/MATLAB." Id. at 163 (emphasis added).

10

- "Using Microsoft Visual Studio, in C#, I have <u>developed</u> user-friendly Windows Forms software applications," and that "I have recently updated my Derived Comparison application."  <u>Id.</u> at 164 (emphasis added).

- Mr. VanMeter's assessment noted plaintiff's development work for a second time, stating that plaintiff "has been working with Spencer's software team to <u>develop</u> new interfaces for IADS that will help the reliability of the data products that RTPS provides to our customers."  <u>Id.</u> at 168 (emphasis added).

5. Performance Evaluation for October 1, 2016, through September 30, 2017

- Mr. VanMeter's assessment noted that plaintiff "has been working with Spencer's software team to <u>develop</u> new interfaces of ODE/MATLAB."  <u>Id.</u> at 171 (emphasis added).

- "I <u>developed</u> user-friendly Windows Forms software applications [ ] which results in a reduction of potential costs to the organization."  <u>Id.</u> at 173 (emphasis added).

- "I conduct software <u>builds</u> and releases of all RTPS V production applications."  <u>Id.</u> (emphasis added).

- Mr. VanMeter's assessment noted plaintiff's development work for a second time, stating that plaintiff "has been working with Spencer's software team to <u>develop</u> new interfaces for IADS that will help the reliability of the data products that RTPS provides to our customers."  <u>Id.</u> at 174 (emphasis added).

- "I have <u>created</u> over 10+ different release versions" of the RTPS V Releases.  <u>Id.</u> (emphasis added).

6. Performance Evaluation for October 1, 2017, through September 30, 2018

- "I am responsible for mission-critical RTPS V software <u>builds</u> and releases for our systems."  <u>Id.</u> at 181 (emphasis added).

11

- "I successfully <u>created</u> and thoroughly tested 8 new RTPS V Releases for deployment to our systems." <u>Id.</u> at 182 (emphasis added).

- "I have <u>created</u> over 15+ different release versions" of the RTPS V Releases. <u>Id.</u> at 183 (emphasis added).

The court is cognizant of the fact that many of these statements were made by plaintiff, and therefore, are not objective accounts of her job duties. The credibility of these statements, however, is bolstered by the circumstances under which they were made. Each of the performance evaluations was reviewed and supplemented by plaintiff's supervisor. <u>See id.</u> at 130-89. Her supervisor at times even responded to what plaintiff had written, demonstrating the order in which the evaluations were completed. <u>See, e.g.</u>, <u>id.</u> at 134 (noting that he "[c]oncur[s] with [plaintiff's] assessment"). The court must draw reasonable inferences in plaintiff's favor in considering defendant's motion, and in the court's view, it is reasonable to expect that had plaintiff misrepresented her duties, her supervisor would have noted that misrepresentation in the performance review documents.

Accordingly, the court finds that defendant has not demonstrated that plaintiff has failed to identify an appropriate comparator. But the court does not affirmatively conclude that plaintiff has carried her burden to do so. The evidence before the court is simply in dispute with regard to the factual issue of defining plaintiff's duties as compared to those of Mr. Barry, Mr. Menard, and Mr. Quade—an issue that is clearly material to plaintiff's case.

In order to resolve this apparent dispute, the parties must present evidence that provides further explanation of each individual's duties. The court recognizes that the differences may be apparent to individuals steeped in the language and environment of the ATR. To the court, however, Mr. VanMeter's statement in his affidavit that "[t]here is no software development, coding, or mathematical algorithms required" to perform plaintiff's duties, ECF No. 32-1 at 103, appears to be at odds with even his own statements. For example, he referred to plaintiff in one instance as "a software developer," and noted elsewhere that plaintiff "has been working with Spencer's software team to <u>develop</u> new interfaces." <u>Id.</u> at 147, 171, 174 (emphasis added).

The court cannot grant summary judgment in defendant's favor on the basis of the evidence before it. And because establishing a prima facie case, which includes identifying an appropriate comparator, is a predicate determination for proceeding, the court will not rule at this time on the availability to defendant of any of the EPA's statutory defenses.

12

B.   Retaliation Claim (Count II)

Defendant also moves to dismiss plaintiff's retaliation claim for lack of subject matter jurisdiction because the claim "sounds in tort." ECF No. 32 at 39. In support of its argument, defendant cites to Jentoft v. United States, 450 F.3d 1342 (Fed. Cir. 2006), in which the United States Court of Appeals for the Federal Circuit held that this court "lacked subject matter jurisdiction to consider [plaintiff's] retaliation claim," which was based on conduct in response to complaints of "gender-based pay discrimination." Id. at 1349, 1345. In response, plaintiff makes no argument in defense of her retaliation claim, and does not attempt to distinguish the Federal Circuit precedent cited by defendant.

Accordingly, the court finds that it lacks subject matter jurisdiction to consider plaintiff's retaliation claim because such claims sound in tort, a category of claims specifically excepted from this court's authority. See 28 U.S.C. § 1491(a)(1).

IV.   Conclusion

Accordingly,

(1)   Defendant's motion for summary judgment and for partial dismissal, ECF No. 32, is **DENIED** in part as to plaintiff's EPA claim (Count I), and **GRANTED** in part as to plaintiff's retaliation claim (Count II);

(2)   Pursuant to RCFC 54(b), as there is not just reason for delay, the clerk's office is directed to **ENTER** judgment **DISMISSING** Count II of plaintiff's complaint for lack of subject matter jurisdiction, without prejudice; and

(3)   On or before **December 4, 2020**, the parties are directed to **CONFER** and **FILE** a **joint status report**. The status report shall state whether settlement is a feasible option in this case or whether the parties intend to file any additional dispositive motions. If dispositive motions are to be filed, the status report shall set forth a proposed schedule in that regard. If neither settlement nor dispositive motions are viable, the parties shall set forth a proposed schedule for the exchanges required by Appendix A, ¶ 13 and the filings required by ¶¶ 14 through 17.

IT IS SO ORDERED.

                                                                         s/Patricia E. Campbell-Smith
                                                                         PATRICIA E. CAMPBELL-SMITH
                                                                         Judge